J. F. DONNELL v. S. R. STEIN, R. G. NAYSMITH and P. J. BRECKEN-RIDGE, Appellants.—53 S. W. (2d) 903.

Division One, October 22, 1932.*

*NOTE: Opinion filed at April Term, 1932, September 3, 1932; motion for rehearing filed; motion overruled at October Term, October 22, 1932.

*Buder & Buder* and *J. Hugo Grimm* for appellants.

*Jeffries, Simpson & Plummer* for respondents.

GANTT, P. J.—Action for fraud by false and fraudulent representations. Verdict for $17,500 actual and $10,000 punitive damages. On motion for a new trial plaintiff remitted $9,000 of the punitive damage. Judgment for $18,500 and defendants appealed.

In substance the petition alleged that plaintiff was the owner of

the capital stock of the Donnell Milk Company of the value of $60,000; that defendants falsely and fraudulently represented to plaintiff that defendant Stein was the agent of an Eastern dairy company of large financial means that had decided to engage in business in St. Louis; that said company would establish milk stations in the city; that the Donnell Milk Company could not compete with it; that its capital stock would for that reason become worthless and that the Eastern company was willing to purchase said stock through Stein and pay therefor $35,000 if plaintiff waived the indebtedness of the Donnell Milk Company to him.

It further alleged that defendant Naysmith, acting in collusion with the other defendants, falsely and fraudulently pretended to act as the trusted employee of plaintiff in determining the value of said stock, and falsely and fraudulently represented to plaintiff that the milk company was not making progress and that the value of its stock was only $35,000 if plaintiff waived its indebtedness to him. It further alleged that plaintiff was by said false and fraudulent representations induced to sell said stock to defendants for said sum.

The answer was a general denial with pleas of estoppel, which pleas are abandoned on this review. The reply was a general denial.

█ Defendants challenge the ruling on the demurrers to the evidence. They seek to have the question determined on the weight of the evidence. It must be determined on the evidence favorable to plaintiff. There was evidence tending to show the following: In 1914 plaintiff incorporated the Donnell Milk Company with a capital stock of 150 shares of the par value of $100, all of which he owned. The company located in St. Louis and engaged in selling milk. Plaintiff was a physician residing at Crystal City, Missouri, and could not conduct the business. He employed defendant Breckenridge and others for that purpose. Plaintiff continued to practice medicine in said city but allotted a few hours to the management of the business. This continued until 1916. He then employed defendant Naysmith as treasurer and manager of the company. He gave him control of all departments, authorized him to collect and pay money, sign checks, supervise the books and accounts, pay income tax and employ and discharge the help. He was given absolute control of the business. Defendant Breckenridge continued as an employee under Naysmith. He had charge of the milk room and was an assistant to the manager. Plaintiff had known him many years and made him secretary of the company. He also was authorized to sign checks, if necessary, in the absence of Naysmith. Plaintiff did not require them to give bond. They were trusted employees of the company. After thus providing for the company, plaintiff continued to practice medicine in Crystal City, but visited St. Louis about twice a month and con-

ferred with Naysmith about the business and finances of the company. At first the business was not profitable and at times plaintiff loaned money to the company. For several years he tried to sell the business, but in 1921 the method of operation was changed and business gradually increased. Thereafter his stock was not for sale. The increase in business was such that at a board meeting in 1922 Naysmith reported that the company "was making too much money." He suggested that his salary be raised $150 a month, Breckenridge's salary raised $50 a month, and that plaintiff be paid a salary of $500 a month instead of paying income taxes to the government. The suggestion was adopted by the board. The next year (1923) Naysmith stated to plaintiff that Gottfried · Schmidt wanted to sell his ten shares of stock in the company. Schmidt purchased the stock at $100 a share in 1916. On advice of Naysmith plaintiff purchased said stock at $200 per share. The business continued to prosper and attracted the attention of defendant Stein. In 1926 he inquired of Naysmith if the business was for sale and was referred to plaintiff. During the conversation Stein requested Naysmith to call at his office for a conference about the matter. In a few days Naysmith did so. Thereafter Stein inquired of plaintiff at Crystal City if the business was for sale. Plaintiff answered that it was not for sale. In the course of the conversation Stein informed plaintiff that he was president of the Cake Cone Company and represented an Eastern company interested in buying a milk business in St. Louis. He invited plaintiff to call and talk the matter over with him. In a few days plaintiff told Naysmith of the conversation. He asked him if he was acquainted with Stein. Naysmith said he did not know Stein and never heard of him. The subject was dismissed by plaintiff stating that he did not want to sell because he had invested $60,000 in farms in Jefferson County, from which he sold milk to the company. He did not call on Stein and returned to Crystal City. Stein again called plaintiff and also wrote him giving his telephone number and inviting him to lunch at the City Club when in the city. Plaintiff showed the letter to Naysmith and remarked: "This fellow is certainly persistent. He certainly wants to buy something." The matter was discussed, but plaintiff again did not call on Stein. Thereafter he again asked Naysmith if he knew Stein and if Stein had ever called at the office. In the meantime Naysmith had been in conferences with Stein, but answered that he had never heard of him. About this time Breckenridge told another employee that plaintiff would not be connected with the company much longer. Stein again called plaintiff, who told Naysmith of the conversation. Thereupon Naysmith suggested that plaintiff call Stein and learn what he had to say about purchasing the business. Stein was called and said that he would "come up right

away.'' Naysmith could not be present at that time and plaintiff told Stein to ''come'' later. Stein did so and introduced himself to plaintiff, who in turn introduced Stein to Naysmith, believing them to be strangers. They acknowledged the introduction as if unacquainted. At the conference Stein told plaintiff and Naysmith that he represented an Eastern company of national organization and large financial means; that it was engaged in the dairy business in Pennsylvania and the South; that it would establish a dairy in St. Louis; that on investigating dairies in said city he found that Donnell Milk Company operated like the Eastern company; that the Eastern company had large experience in the dairy business and more money than the Pevely Dairy; and that it would be in competition with plaintiff if it purchased another dairy. Stein said that he thought he could put the deal through at a reasonable price, but did not ask plaintiff to price the stock. He said that he was compelled to leave and that plaintiff could talk the matter over with Naysmith. Plaintiff and Naysmith then discussed the matter and Naysmith said: ''Doctor, if those people come to St. Louis and buy up some dairy here and lease branches in the neighborhood, or reduce the price on retail milk here, we would be out of luck.'' They continued to have conferences about the matter and Naysmith suggested a price which discouraged plaintiff. He said if the Eastern company leased the Donnell Milk Company's stations, plaintiff would have only the building and equipment; that it was a good chance to sell at a price; that the milk company was not doing so well and was losing money and that he believed it was time to get out. He did not submit to plaintiff a financial statement and plaintiff made no examination of the books. Thereafter on September 15, 1926, Naysmith told plaintiff that he had been loyal and had given him the best he had for ten years, and that he had better sell if he could get a fair price. On that day he drove plaintiff to the office of Stein, who presented an option contract providing for the payment of $40,000 for the stock if plaintiff cancelled the company's indebtedness to him and paid a note for $16,500 secured by a deed of trust on real estate of the company. Plaintiff told Naysmith he would not pay said note and that he had better give away the business. Naysmith said that if the Eastern company would pay $40,000 and assume the payment of said note that it would be better for plaintiff to sell the business. Plaintiff stated that he would sign no contract without consulting his lawyer. Thereupon Stein, Naysmith and plaintiff went to the office of plaintiff's attorney. The matter was explained and the attorney prepared an option contract. It provided an option to purchase the stock, free of debts, within fifteen days for $40,000, the purchaser to pay the indebtedness of $16,500 on the real estate. At this time Stein contended that plain-

tiff should pay him a commission for making the sale. Plaintiff told Stein the Eastern company should pay its agent. Stein agreed and it was written in the contract that plaintiff was to pay no commission. Thereupon plaintiff and Stein signed the option contract. On September 24, 1926, Stein agreed in writing to sell to Naysmith and Breckenridge 75 shares of stock of the Donnell Milk Company for $20,000. On September 28, 1926, Naysmith told plaintiff that the Eastern company was ready to close the deal and that he should come to the city the next morning. Plaintiff did so and Naysmith drove him to Stein's office. Stein said he had been in communication with the Eastern company and that it would pay only $35,000 for the stock. He said plaintiff could talk it over with his manager, and left the room. Plaintiff then said to Naysmith that he could not accept $35,000. Naysmith said the stock was worth only $35,000 and advised him to accept the offer. On Stein's return, plaintiff told him that he would accept $35,000, but said he wanted his salary from the company for the month of September. Stein said he would have to telephone and left the room. He returned in twenty minutes and agreed to the payment of said salary by the company. Another contract was then drawn by Stein's attorney and approved by plaintiff's attorney. Plaintiff signed the contract and was paid $32,500, and later paid $2,500. He continued to ship milk to the company from his farms and continued to visit the office of the company. He asked Naysmith about the Eastern company. Naysmith said that, so far as he knew, Stein was the owner and that Stein had given him one or two shares of stock and made him president of the company. Plaintiff also asked Breckenridge about the Eastern company. He also said that he had been given one or two shares of stock and made vice-president of the company. On October 1, 1926, Stein, Naysmith and Breckenridge, as directors, found that the company had assets amounting to $74,529.35 and liabilities amounting to $24,292.99. Thereupon they voted to increase the capital stock from $15,000 to $50,000, and the necessary steps were taken to accomplish that purpose. They made affidavit that the net assets of the company were $55,000. This included $5,000 which defendants assert was paid to the company by Breckenridge after the purchase of the stock from plaintiff. In the meantime plaintiff learned that on September 24, 1926, Stein sold to Naysmith and Breckenridge the 75 shares of stock. He also learned the capital stock had been increased as voted by the directors.

On this evidence the jury could find that defendants plotted together to acquire from plaintiff the capital stock of the company. Even so, defendants contend that the statement that an Eastern company would locate in St. Louis and destroy plaintiff's business

was not a material representation. They argue that if plaintiff was willing to sell the stock for $35,000, it could not be material to whom it was sold. But plaintiff did not want to sell. He was pursued by Stein and frightened by Naysmith until he did sell. Defendants pursued him to the end of the negotiations with such statements. Even the contract provided that the stock was sold to "Stein or any person, firm or corporation he might designate." This caused plaintiff to believe that Stein represented an Eastern company and that he would transfer the stock to it.

They next contend that said statement was the expression of an opinion and not the representation of an existing fact. At every conference and over the telephone Stein stated to plaintiff that an Eastern company of vast experience and large financial means was about to locate in St. Louis. Finally he stated that: "We are going to buy a dairy, Doctor, and my people are urging me to hurry up." In the meantime Naysmith was making discouraging statements about the business to plaintiff and leading him to believe that the business would be destroyed. In these statements we find no mere expression of an opinion.

They next contend that the statement of Naysmith that the Donnell Milk Company could not compete with the Eastern company was only the expression of an opinion. We do not think so. Plaintiff had no knowledge of the business. At all times he relied on Naysmith, an experienced dairyman, who knew the business as conducted in St. Louis, knew the finances of the Donnell Milk Company, and was the trusted employee of plaintiff with full knowledge of conditions. As such his statement as to the futility of competition with this company of vast experience and large financial means was the statement of an existing fact. Furthermore, the statement of Naysmith to plaintiff that the company was not making progress and the stock was worth only $35,000 was the statement of a fact. During the negotiations Naysmith did not appear as a purchaser. At all conferences with Stein and between said conferences he was the trusted employee on whom plaintiff was leaning. He had been manager of the company for ten years, was familiar with all of its property and knew every detail of the business. Under such circumstances, a statement as to the condition of the company and the value of its stock is not a mere expression of opinion. This is not a case of parties dealing at arms length. Naysmith pretended to represent plaintiff during the negotiations. Stein assisted in this pretense by treating Naysmith, in the presence of plaintiff, as the trusted manager with full knowledge of the business.

They next contend that the stock was worth only $35,000 and for that reason plaintiff was not damaged. In making this con-

tention they also argue from evidence favorable to them and do not consider the ''good will'' of the business. The evidence favorable to plaintiff tends to show that the stock was worth from $50,000 to $75,000. The question was for the jury. It follows that the demurrers were well ruled.

■ They next contend that the court erred in admitting the testimony of Adam Thornton, who testified as an expert on the value of dairies in St. Louis. At the trial they did not challenge his qualifications as an expert. They did object to the hypothetical question as not correctly submitting certain facts in evidence. Plaintiff changed the question to conform to the contention of defendants, and the witness answered giving his opinion of the value of the stock. The contention is overruled.

■ They next contend that the court erred in admitting certain testimony given by plaintiff. The testimony was given during the cross-examination of plaintiff as to when and how he reached the conclusion that he had been ''double-crossed.'' The question follows: ''Where did you find out it (the stock) was worth more money?'' Plaintiff gave several sources of information and further answered that an accountant said to him: ''Doctor, it looks to me like you had a pretty good thing. How in the world did you come to sell it?'' Of course, it was not admissible as evidence of the value of the stock, but it was responsive to the question. Moreover, no motion was made to strike out the answer.

■ They next contend that the court erred in refusing an instruction which, in effect, withdrew from the jury the evidence that on September 24th Stein agreed to sell and Naysmith and Breckenridge agreed to buy 75 shares of stock of the company. Stein did not sell them said stock. He only agreed to do so. He had an option but had not acted on it. The evidence as to the agreement of Stein to sell stock to the other defendants was admitted without objection. The evidence that Naysmith and Breckenridge concealed from plaintiff the fact that they owned stock in the company was also admitted without objection. We think all of this evidence was competent and was properly submitted to the jury to be considered with other evidence in determining the question of conspiracy. Of course, the mere agreement of Stein to sell stock to the other defendants would not be evidence of a conspiracy.

■ They next contend that the court erred in instructing the jury that if they found that defendants were jointly interested and jointly engaged in the negotiations which led to the sale of the stock on September 29th, then the representation, if any, of a defendant was the representation of all the defendants.

Defendants admit that Naysmith and Breckenridge were interested

428

in the negotiations to buy the stock after September 24th, the date they agreed to purchase 75 shares of the stock from Stein. From this they argue that the instruction made said defendants liable even though they had not been interested in the negotiations that induced plaintiff to give Stein the option on September 15th. They also argue that the making of the option contract of said date could not have been induced by what occurred thereafter.

It will be noted that in making this contention the defendants proceed upon the theory that plaintiff sold the stock on September 15th and that he is seeking damages for respresentations which induced him to give Stein the option of that date. The petition discloses that plaintiff is not seeking damages for representations which induced the giving of said option, but is seeking damages for representations which induced him to sell the stock for $35,000 on September 29th. Furthermore, the instruction was a direction to the jury that the defendants must be jointly interested in the negotiations which led to the sale. In other words, it was a direction that the defendants must be jointly interested in all said negotiations. The jury must have so understood the instruction.

They next contend that the court erred in instructing the jury that if they found that in the month of September, 1926, or prior thereto, the defendants, or any of them, contrived to obtain from plaintiff his stock at a price below its value, and that in furtherance of such purpose made the representations set out in A, B and C, or any of them, and that they were false, known to be false by the person making them, etc., and that the plaintiff relying upon them sold his stock for $35,000 and that it was worth in excess of that sum, then their verdict should be against such of the defendants as they believed from the evidence participated in the *procuring of said stock* from the plaintiff *through the means aforesaid*. They argue that the words "procuring of said stock" could only be understood as participating in the negotiations of September 29th, in which negotiations Naysmith and Breckenridge admitted they participated. In making this argument, they overlooked the words "through the means aforesaid." These words referred to the representations set out in the instruction as A, B and C, and alleged in the petition as the false representations for which plaintiff was seeking damages.

The judgment should be affirmed. It is so ordered. All concur.